# Bank of the Northern Liberties, Garnishees of Thomas. C. Jones, *versus* Jones & Cole.

*Bank Deposits by an "Agent" belong to his Principal.*

A deposit in bank by a depositor, as "agent," is *primâ facie* the property of his principal, and is not liable to attachment for the debt of the "agent;" but in all such cases the name of the principal should be stated on the account.

ERROR to the District Court of *Philadelphia*.

This was an attachment execution in the District Court of Philadelphia, in which Rowland Jones and George W. Cole, trading as Jones & Cole, were plaintiffs, and The Bank of the Northern Liberties, garnishees of Thomas C. Jones, were defendants.

After interrogatories had been filed and answered, the plea of *nulla bona* was entered by the defendants, on which the parties went to trial.

The case was this:—Thomas C. Jones, against whom Jones & Cole held a judgment, had for a long time been a depositor in the Bank of the Northern Liberties, in the name of "Thomas C. Jones, agent," checks being drawn by him from time to time in that form against the sums deposited, which were regularly paid by the bank.

The plaintiffs below having read the answers of the garnishees, which disclosed the fact that the deposits made by Jones were made as agent for different persons, and having called the book-keeper of the bank, who proved that the deposits were made, as shown by his bank-book, in the name of "Thomas C. Jones, agent," closed their case.

The bank as garnishees, and the parties whose moneys, deposited by said Jones as their agent, had been attached; then offered to prove that the moneys were none of them the moneys of said Jones, but that they were made up of various sums belonging to parties of whom he was the agent, and partly of moneys belonging to an estate of which he was the acting executor ; but the court refused to admit the testimony, which was assigned here for error.

*Abrahams*, for claimants, and *Charles E. Lex*, for the garnishees, argued that this case differed entirely from the case of Jackson *v.* The Bank of the United States, 10 Barr 61. In that case the deposits and account were kept in the name of the defendant against whom the attachment issued, without any mark or designation whatever to distinguish them, or any notice whatever that any other person had an interest in them. Here

[Bank of Northern Liberties *v.* Jones.]

the character of the deposit was disclosed upon its face. It was made with the term "agent" attached, which implied that the depositor was acting in a fiduciary capacity, and that the moneys deposited were not his own. It was manifestly impossible for the depositor to do more, under the circumstances of the case, than add the term agent. Had he acted for one only, then the party for whom he was acting might have been disclosed, but this could not be required when, as it was proved, he was acting for many. Had notice been given to the bank by the parties for whom he was acting, not to pay over to him, they would have been obliged to obey it. The position of the account, therefore, being sufficient to notify the bank that he was acting for others, the attaching creditors can have no higher claims on that which Jones never claimed as his own. The case of The Farmers' and Mechanics' Bank *v.* Benj. Scott, Jr., decided at the last term of the Supreme Court, was of the same character as that of The United States Bank *v.* Jackson. The deposit was there made with no mark whatever to designate it as not being the exclusive property of the depositor. Both cases, therefore, differed from the one now submitted to the court.

*Sharpless*, for defendants in error, contended that the case was ruled by Jackson *v.* The Bank of the United States, 10 Barr 61, and The Farmers' and Mechanics' Bank *v.* Thoms; and that the addition of the word "agent" was not sufficient to ear-mark the fund, or indicate the names of other owners.

The opinion of the court was delivered, May 10th 1862, by

READ, J.—"Money, when paid into a bank, ceases altogether to be the money of the principal; it is then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him, when he is asked for it." The money placed in the custody of a banker is to all intents and purposes the money of the banker, to do with it as he pleases; he is guilty of no breach of trust in employing it; "he is not bound to keep it or deal with it as the property of his principal, but he is of course answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands."

"The trade of a banker is to receive money and use it as if it were his own, he becoming debtor to the person who has lent or deposited with him the money to use as his own, and for which money he is accountable as a debtor." "I cannot at all confound the situation of a banker with that of a trustee, and conclude that the banker is a debtor with a fiduciary character:" Hill *v.* Foley, 2 House of Lords' Cases 36, 37, 44. A banker

[Bank of Northern Liberties *v.* Jones.]

is therefore in relation to his customer, neither a trustee nor a *quasi* trustee, but simply a debtor to him for a loan. The relation thus established is that of debtor and creditor merely, unaccompanied by any fiduciary connection.

Third persons may, however, have rights over the debt thus created, and such claims have given rise to several decisions which it becomes necessary to examine, in order to ascertain the principles settled by them, so far as they are applicable to the present case.

In Sims *v.* Bond, 5 Barn. & Adol. 389, which was an action for money had and received, to recover the balance of an account with a banker in the name of another, upon the allegation that it was the money of the plaintiffs, Lord Denman said, " Sums which are paid to the credit of a customer with a banker, though usually called deposits, are in truth loans by the customer to the banker: Carr *v.* Carr, 1 Meriv. 341, with Devaynes *v.* Noble, 1 Id. 568; and the plaintiffs who seek to recover the balance of such an account must prove that the *loans* were made by *them.*" " We do not say that where a person lends money nominally on his account, but really on account of and as the loan of another, the real lender may not sue for the money. But where money is lent by another in his own name, the plaintiff who alleges that he was in reality the lender, must prove that fact distinctly and clearly. He must show that the loan, though nominally that of another, was really his own."

In Cooke *v.* Seely, 2 Exch. 746, Baron Parke, in speaking of Sims *v.* Bond, which had been decided fifteen years before, said in that case : " The court considered that it might be shown that a banking account, though in the name of one partner, was in truth the partnership account; but then it must be made out by distinct evidence." " We think," said the learned Baron, " there is evidence which ought to have been submitted to the jury, that Farquar, in opening the account, was acting as agent for the partnership. The mere fact of the money being partnership property would not be sufficient, because one partner might take a portion of the partnership property and lend it to another, but in this case there are two circumstances which did not occur in Sims *v.* Bond. One is, that though the account was opened in the name of Farquar, the letters 'B. C. C.' were in the pass-book. It is for the jury to decide whether by that, Farquar meant to keep the account on behalf of the company, or whether these letters were a mere private memorandum." " However, Sims *v.* Bond decided that the private name in the pass-book is not conclusive, as by the usage of merchants the name on a bill of exchange, but its only effect is to throw upon the parties suing, the obligation of showing that they were the real contracting parties. The question in this case will be

whether that is made out to the satisfaction of the jury. If this'
had not been a deposit by a partner, but by a third person, the
matter might have been set at rest by calling that person to
prove on whose account he really was lending the money to the
bank."

. In Tassell v. Cooper, 9 Com. Bench Rep. 509, where the
farming bailiff of Lord De L'Isle and Dudley (after his employ-
ment as such had ceased) renewed a check for 180l. in payment
for wheat belonging to Lord Dudley, which he had sold on his
account while acting as bailiff, and paid it to his own account
with B. & Co., his bankers, who received the cash for it, and
gave the bailiff credit for the amount, but afterwards, on an in-
demnity from Lord Dudley, refused to honour his drafts,—it was
held that even assuming the check had been improperly obtained
by the bailiff, still as between him and his bankers, the amount
was recoverable by him as money had and received by them to
his use, or money paid. Upon the argument Cresswell, J., said,
"It is now settled that money paid in by a customer to his
banker is money *lent* to the latter: Potts v. Clegg, 16 M. & W.
321. Money paid out to the customer pays off the earlier debt;
if this were not so the earlier debt might be barred by the Statute
of Limitations." Maule, J., said (p. 532), "It seems to me
quite clear that the account in question is a banking account of
the ordinary kind, by the plaintiff as his own account with the
London and County Joint Stock Banking Company; and that it
is not competent to any third party to interfere and to say that
the banking company in reality contracted with him. This is
plainly evidenced by the way in which the account was kept; it
was a general account, embracing as well the plaintiff's own
moneys as moneys received by him in his capacity of agent for
Lord De L'Isle, and purporting to be an account between the
plaintiff and the bankers only." Williams, J., said, "If we
were to decide otherwise, I think we should be promulgating a
doctrine that would be found very injurious to bankers."

In Bodenham v. Hoskins, 16 Jurist 721, Parkes, a solicitor at
Hereford, and who was employed by Charles Thomas Bodenham
as the receiver of the Rotherwas estate, of which Mr. Bodenham
was owner, had three separate accounts with the banking firm.
The first was called the "Private or Office Account," which he
was allowed to overdraw, he stating that he intended to intro-
duce the Rotherwas account. On the 25th of October 1846, he
overdrew his office account 1037l., and on the same day his clerk
opened an account to be called the "Rotherwas Estate Ac-
count," and paid 700l. to the credit of it, stating that the check
which Parkes would draw would be so endorsed, and that Parkes
wished it to be kept separate from the other account. A third
account called "The General Account," and consisting of his

[Bank of Northern Liberties *v.* Jones.]

other clients' money, was afterwards opened by Parkes. On the 9th July 1847, Parkes drew a check for the balance of the Rotherwas account, amounting to 849*l.*, and paid it into the "Office Account," which account was then largely overdrawn. Parkes became insolvent, and Bodenham filed a bill against the partners in the bank, which was sustained by Vice-Chancellor Kindersley, who decreed the repayment of the 849*l.* by the defendant to the plaintiff, saying, "Now then I am constrained to arrive at the conclusion that the bankers—although I must exonerate them from any deliberate intention to commit a robbery or commit a fraud—that the bankers were not only parties to the simple fact of the transfer, but were parties to the fraud in question; in this sense that they were aware of the circumstances which made it a fraud in Parkes to make the transfer to his private accounts, and being cognisant of that, and having been cognisant of it before that time when the account was opened under the name of the 'Rotherwas Account;' they being cognisant of that throughout, concur in a transaction the effect of which is that for their own pecuniary benefit an act is done by Parkes, which is a fraud upon the plaintiff. Now, according to the plain principles of a court of equity, such an act never can be sustained."

In Wilks *v.* Groom, 25 Law J. Rep. Ch. 724, where the vice-chancellor held, under the circumstances, that an administratrix with the will annexed was not liable for moneys of the estate lost by the failure of private bankers, with whom they were deposited, the money having been carried to the credit of Mrs. Wilks, as administratrix, "quite independently of and unconnected with any moneys belonging to herself or any other person; she herself, in fact, having no other moneys in the hands of those bankers." "It was, therefore," said the vice-chancellor, "ear-marked; not ear-marked so that the bankers could not by their failure cause a loss of it, but ear-marked so as to distinguish it from the moneys of any other persons arising from any other source."

In Bridgman *v.* Gill, 24 Beavan 302, a fund was standing to the account of two trustees, in the books of some bankers who had notice that it was a trust fund, the court having held from the heading of the account, as well as from the evidence in the cause, that the bankers had notice that it was trust-money. The tenant for life of the fund being a debtor of the bankers, without any authority from the trustees, gave a check on the fund for £750, which was appropriated to the payment of this debt to them. Upon a bill filed by the trustees against the bankers, Vice-Chancellor Wood said: "The most remarkable thing is that the defendants should have resisted the relief sought. The case as it stands on the undisputed facts is this: In 1843 a sum of

[Bank of Northern Liberties v. Jones.]

money was standing in the defendants' books to the credit of the plaintiffs, and which the defendants transferred to themselves in discharge of a debt due to them from another person, and this was done without the slightest sanction or authority of the plaintiffs to support it."

" I think it totally immaterial that the defendants had no notice of what the precise trusts were; all that it was necessary for them to know was, that this was a trust account, and that the fund was held by the plaintiffs as trustees."

Frazier v. The Erie Bank, 8 W. & S. 18, was a case of fraud, and was correctly decided; and so also was The Bank of the United States v. Macalester, 9 Barr 475; where funds were deposited with the bank for a special purpose, with notice to the bank of what that purpose was, and it was held that they could not refuse to apply them to the object for which they were deposited, on the ground that a debt on a different account was due them from the depositor.

In this case there were two accounts opened with the bank, the first in the name of the " Illinois Canal Commissioners," and the second in the name of " R. T. Barrett, Fund Commissioner of Illinois," and the court were of opinion that the balance of the first account, which was devoted to a particular object communicated to the bank, could not be diverted by the bank to the payment of a balance due them on the second account, with which the first account had no possible connection whatever.

The next case is that of Jackson v. The Bank of the United States, 10 Barr 61, which was supposed by the court below to rule the case before us. This decision is sound law, and is founded upon enlightened principles of public policy arising from the established relation of debtor and creditor, and the imperative necessity of requiring the ostensible and public appearance of such moneyed transactions to be considered as the reality. The account was in the name of the depositor, the cash paid and drawn out were all his individual acts, and were so recognised and treated by the bank, and no other person gave notice to the bank that he had any interest in the fund, or made any claim of any kind to any part of it during a long and protracted course of litigation of several years. It is distinctly supported by the English cases we have cited, and particularly by that of Tassell v. Cooper.

The question is, is the present case governed by it, or is it not included within the rulings in Bodenham v. Hoskins, Cooper v. Seeley, and Bridgman v. Gill?

The account is an agency account, headed in the bank-book, called in England the pass-book, " Thomas E. Jones, Agent;" and this, we suppose, corresponds with the books of the Bank of the Northern Liberties. The allegation is that this was really

[Bank of Northern Liberties *v.* Jones.]

nothing but an agency account, and so understood both by the customer and the bank, and containing only the moneys of other persons for whom he was agent, and no moneys of his own at all. This was really asserted by the bank, and also by the depositor, who had so far ear-marked it as to show it was not his own, but was really the property of others.

If there had been separate accounts, each headed as the agency account of such an estate or person, which is certainly the safer mode for all parties, and is perhaps the only really correct one, there could have been no doubt (supposing the reality to correspond with the appearance) that no creditor of the agent could have attached a farthing of either or any of the funds so ear-marked.

We, however, think under the circumstances, the evidence offered should have been admitted, but whether it could have been satisfactorily made out is entirely another question. The case, however, illustrates the propriety of opening separate accounts appropriately designated, so that each fund may be distinctly ear-marked, and thus prevent all difficulty in case of death, failure, or any accident destroying the evidence of identity under a general agency account. It is proper to say that such an account as the present, not designating the individuals who are the real owners of the money deposited, should be avoided both by the bank and its customer, and I am informed by the cashier of one of our oldest banks of large capital in this city, " that his institution invariably refuses to open an account with the addition of ' agent' or ' attorney' to the proper name of the depositor."

Notwithstanding the disapprobation of a learned judge (Paxson *v.* Sanderson, 3 Phila. Rep. 303), we hold Jackson *v.* Bank of the United States to be good law, and it is not our intention to disturb it.

Judgment reversed, and a *venire de novo* awarded.